**SOUTHERN PACIFIC TRANSPORTATION COMPANY, Plaintiff,**

v.

**MAGA TRUCKING COMPANY; et al., Defendants.**

**No. CV–N–89–352 BRT.**

United States District Court, D. Nevada.

March 14, 1991.

Alfred Osborne, Reno, Nev., for plaintiff.

Charles W. Spann, Reno, Nev., for defendants.

## ORDER DENYING SUMMARY JUDGMENT

BRUCE R. THOMPSON, District Judge.

This action was brought by Southern Pacific Transportation Company (S.P.) against Maga Trucking Company (Maga) for damages to its equipment, tracks, and freight resulting from a collision on June 12, 1989 of its train with a tractor and trailer owned by Maga which had become stranded across the railroad tracks at the Herschell Road crossing approximately 8.5 miles west of Winnemucca, Nevada. S.P. alleged negligence of the Maga driver. Maga counterclaimed for damages to its tractor-trailer allegedly caused by S.P.'s negligent maintenance of the crossing. S.P. has moved for summary judgment upon the ground that federal law has preempted the field of the standard of care respecting railroad safety and that there can be no cause of action predicated on state law concepts of negligence. During the discovery period the evidence on this issue has been fully developed.

The federal statutes and regulations implicated by the motions are the Federal Railroad Safety Act (FRSA) (45 U.S.C. § 421 et seq.) and the Federal Aid Highway Act (23 U.S.C. § 101 et seq.).

45 U.S.C. § 434 provides:

The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

23 U.S.C. § 130(d) provides:

**Survey and schedule of projects.—** Each State shall conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose. At a minimum, such a schedule shall provide signs for all railway-highway crossings.

The Department of Transportation (DOT) has prescribed some safety regulations pertaining to the installation and maintenance of railroad tracks and the roadbed (49 C.F.R. § 213.1 et seq.), none of which are applicable to the alleged facts of this case.

Nevada has a statute which implements the requirements of 23 U.S.C. § 130(b), *supra*. This statute, NRS § 704.300, provides:

1. After an investigation and hearing, which has been initiated either upon the commissions own motion, or as the result of the filing of a formal application or

complaint by the Department of Transportation, the Board of County Commissioners of any county, the Town Board or Council of any town or municipality, or any railroad company, the commission may determine, an order for the safety of the travelling public:

a. The elimination, alteration, addition or change or a highway crossing or crossings over any railroad at grade, or above or below grade, including its approaches and surface.

b. Changes in the method of crossing at grade, or above or below grade.

c. The closing of a crossing and the substitution of another therefor.

d. The removal of obstructions to the public view in approaching any crossing.

e. Such other details of use, construction and operation as may be necessary to make grade crossing elimination, changes and betterment for the protection of the public and the prevention of accidents effective.

Pursuant to these legislative authorizations the State of Nevada DOT on February 2–4, 1987 conducted a diagnostic railroad safety review of nine crossings. Among the participants were representatives of the DOT, the S.P., the Union Pacific Railroad, Humboldt County, Lander County, Washoe County, the Federal Highway Administration, and the Nevada Public Service Commission. The report and findings, dated June 17, 1987, respecting the Herschell Road crossing are as follows:

*740–796R, M.P. 408.87 SPTCo. Herschell Rd. in Humboldt County:* This crossing is located on the S.P. mainline about eight and a half miles west of Winnemucca. The road ties into Grass Valley Rd. and serves several local ranches, homes, and mining interests in the area. Traffic is between 50 and 100 ADT with 20 thru trains including high speed Amtrak passenger trains. Maximum allowable train speed is 70 mph. The roadway speed is unposted but probably averages 45 mph, except at the crossing itself which has to be taken at 15 to 20 mph. The roadway alignment makes a 'dog-leg' at the crossing and was the cause of a single car rollover on Sept. 17, 1986. The terrain is relatively flat except for the grade over the crossing (6' ±embankment). The crossing itself consists of timber planks in very rough condition, is too narrow (15'), and is on an (sic) 5° skew angle. The roadway approach width is 18'. Sight distance exceeds minimum requirements of 840' in advance of the crossing and 904' down the track. Existing protection consists of passive signing, crossbuck signs (R15–1) and advance warning signs (W10–1). The National Transportation Safety Board (NTSB) has recommended all mainline high speed crossings used by Amtrak be protected with automatic gates.

The diagnostic review team, therefore, recommends the crossing be upgraded with flashing lights augmented with automatic gates. Existing power is located near the crossing, approximately 46' west of the roadway and 52' south of the track. The crossing surface will be upgraded as follows: relocate the crossing 30' west to eliminate the dog-leg, flatten the approach gradient, widen crossing to 30' (future roadway width will be 24") and install an (sic) 'Omni' prefab crossing panels (sic). The track substructure will be rehabilitated including construction of a drywell, new sub base, lateral perforated drains, engineering fabric, new ballast, crossties, and 136# CWR rail. The realignment of the southerly cattleguards, the remainder of the roadway R/W is by prescriptive rights according to the County Road Superintendent, Jim Smith. County 'force account' labor will be used to construct the new roadway fill (use 6:1 fill slopes), pave an all weather, roadmix asphalt surface on the approach landing platform, approximately 24' × 100', install 75' galvanized, highway guardrail on both approaches, blade out old approach, and install new advance warning signs and pavement markings. There is a BLM/County borrow pit approximately two miles south of the crossing.

Traffic control will consist of a standard two lane closure when necessary. The new crossing and roadway will be constructed first, then traffic will be shifted over; however, the new road will not be open to traffic until the automatic gates are in operation. Concrete barricades from the NDOT district maintenance yard may be used (if available) to keep the crossing closed until the signals are operational and the roadway construction is complete

By June 12, 1989 (the date of the collision in question) none of the recommendations of the report had been followed. The excuse of the S.P. is that the federal government had not supplied the funds to make the improvements and that it had no duty to act until funds were provided.

The S.P. has persisted in its contention that the federal laws and regulations have preempted the field of railroad safety and that all state standards, including state common law standards of actionable negligence, have been obliterated. To put it more bluntly, S.P. asserts that in a field occupied by federal regulation we have no duty to do anything for the safety of the general public, vehicles crossing the tracks, the train, the freight, the passengers and our employees that the federal directives have not required us to do.

We quote from S.P.'s brief on the issue of preemption:

Virtually all recent federal cases on grade crossing improvements hold that federal regulations preempt the law of the states, so as to preclude damage claims against railroads under state law. *See Sisk v. National R.R. Passenger Corp.*, 647 F.Supp. 861 (D.Kan.1986); *Nixon v. Burlington Northern Ry.*, (D.Mont.1988) (Civ. 85–384, [1988 WL 215409] 1988 U.S. Dist. LEXIS 16477, *See* Exhibit 'A' attached to Reply in Support of Motion to Strike; *Singer v. Southern Railway Co.*, (N.C.Superior Ct.1989) (Civ. 88 CVS 3898), *See* Exhibit 'B' attached to Reply in Support of Motion to Strike; *Flynn v. Howard,* (Dist. Ct.N.D.1989) (Civ. 89 CO 21, Order on Motion in Limine, *See* Exhibit 'C' at-

tached to Reply in Support of Motion to Strike); *CSX Trans., Inc. v. Public Util. Comm. of Ohio,* 88–4185 [901 F.2d 497] (S.D.Ohio Apr. 13, 1990); *Burlington Northern R. Co. v. Montana,* 880 F.2d 1104 (9th Cir.1989); *Missouri Pac. R. Co. v. Railroad Comm'n of Texas,* 850 F.2d 264 (5th Cir.1988); *National Ass'n of Regulatory Utility Commr's v. Coleman,* 542 F.2d 11 (3rd Cir.1976); and *Donelon v. New Orleans Terminal Co.,* 474 F.2d 1108 (5th Cir.1973), *cert. denied,* 414 U.S. 855 [94 S.Ct. 157, 38 L.Ed.2d 105] (1973).

Perhaps the first case construing the Federal Aid Highway Act in this context is *Runkle v. Burlington Northern,* 188 Mont. 286, 613 P.2d 982 (1980), in which the Montana Supreme Court observed:

Thus the fact that the Montana Highway Department or the town of Troy had not officially acted to require the railroad to provide traffic control devices other than the crossbucks is not in itself sufficient to absolve the railroad of its common law duty, if it existed, to provide a good and safe crossing.

Similarly, in *Karl v. Burlington Northern Railroad Company,* 880 F.2d 68 (8th Cir.1989), the court said:

Burlington Northern also argues that because Iowa statutes specifically set forth safety requirements applicable to grade crossings, and as Burlington Northern was not found to have violated these statutes, it should not face liability at common law for negligence. It is well established, however, that '[c]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.' *Restatement (Second) of Torts* § 288C (1965); *accord Schmitt v. Clayton County,* 284 N.W.2d 186, 190 (Iowa 1979). While Iowa courts have not yet had occasion to apply this rule in the context of a railway crossing accident, courts nationwide have adopted the *Restatement* standard in circumstances similar to those here. See Dueffert, *The Role of Regulatory Compliance in Tort*

*Actions*, 26 Harv.L.J. on Legis. 175, 180–88 (1989). The district court did not err in submitting the issue of Burlington Northern's negligence to the jury.

Finally, we have the case of *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149 (9th Cir.1983), wherein the court held:

█ The locality in charge of the crossing in question has made no determination under the manual regarding the type of warning device to be installed at the crossing. Until a federal decision is reached through the local agency on the adequacy of the warning devices at the crossing, the railroad's duty under applicable state law to maintain a 'good and safe' crossing, Mont.Code Ann. § 69–14–602 (1981), is not preempted. Evidence concerning the adequacy of the warning device at the crossing in question was properly admitted.

See also *Edwards v. Consolidated Rail Corp.*, 567 F.Supp. 1087, 1100–01 (D.C.Col. 1983).

From time immemorial the railroads in this nation have been required, with respect to the safety of its passengers, employees, the general public and the property of others, to use ordinary and reasonable care under all the circumstances. Plaintiff's broad assertion of federal preemption of all standards of care except those explicitly ordered is not supported by any of the cases we have studied. Preemption has been limited to voiding state statutes and local ordinances governing rail safety requirements in specific areas governed by federal regulation. An excellent example is *Burlington Northern Railroad Co. v. Montana, supra,* in which the Ninth Circuit held that federal regulation had preempted a state law requiring manned cabooses on freight trains by adopting modern telemetry devices to assure safety at the rear of trains. The case does not hold that if an injury was proximately caused by negligent installation or maintenance of the telemetry devices it would not be actionable.

Also, if some courts are so concerned by preempting the state common law of negligence, what forecloses the recognition of the federal common law of negligence? For example, in *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), the Supreme Court of the United States relied on the federal common law to hold that an occupational disease was a compensable injury under the federal statutes there involved, saying: "We do not doubt that at 'common law the incurring of a disease or harm to health is such a personal wrong as to warrant a recovery if the other elements of recovery for tort are present.'" See also *Hampton by Hampton v. Federal Express Corp.*, 917 F.2d 1119 (8th Cir.1990).

It is important to note that this decision is not supported or influenced by any knowledge of the facts respecting the stranding of the Maga vehicle on the railroad crossing and the subsequent collision. Plaintiff's position is that it makes no difference what the facts are, federal law preempts any cause of action for negligence. With this we disagree. The report of the Nevada DOT finds substantial safety deficiencies in the Herschell crossing. Whether any such deficiencies were a proximate cause of the collision has not been demonstrated. There is some indication in the evidence that S.P. knew of dangerous conditions in the Herschell crossing as early as 1983. It may be that a relatively simple repair such as filling in holes in the roadbed and replacing worn or broken planking would have been enough for the crossing to be safely traversable by the Maga equipment. Or, perhaps the stranding of the vehicle was entirely the fault of the Maga driver. These are all questions for another day.

In consideration of the premises,

IT HEREBY IS ORDERED that plaintiff's motion for summary judgment dismissing defendants' counterclaims is hereby denied.