Robert E. HATFIELD,
Plaintiff–Appellee,

v.

BURLINGTON NORTHERN RAILROAD
COMPANY, Defendant–Appellant.

No. 91–3158.

United States Court of Appeals,
Tenth Circuit.

March 6, 1992.

Phillip R. Fields, Wichita, Kan., for defendant-appellant.

Timothy J. King (Terry S. Stephens, with him, on the briefs) of Stinson, Lasswell & Wilson, Wichita, Kan., for plaintiff-appellee.

Before McKAY and MOORE, Circuit Judges, and ALLEY, District Judge.*

JOHN P. MOORE, Circuit Judge.

## I.

This is an interlocutory appeal under 28 U.S.C. § 1292(b) from a decision denying Burlington Northern Railroad Company's motion for partial summary judgment on the issue of whether Robert E. Hatfield's common law negligence claim arising from a grade crossing collision is preempted by the Federal Railroad Safety Act. The district court held preemption had not occurred. *Hatfield v. Burlington Northern R.R. Co.*, 757 F.Supp. 1198 (D.Kan.1991). We reach the opposite conclusion and reverse.

Plaintiff Hatfield filed a multi-claim complaint alleging the defendant Burlington Northern Railroad was negligent because, among other reasons, it did not install an active warning device at a grade crossing

* The Honorable Wayne E. Alley, United States District Court Judge for the Western District of Oklahoma, sitting by designation.

where a truck he was driving collided with one of Burlington's trains. At the time of the collision, the crossing was marked only by a standard crossbuck sign. Burlington moved for partial summary judgment on this claim, contending it had been preempted by the Federal Railroad Safety Act (FRSA), 45 U.S.C. § 421 et seq., and railroad safety rules, standards, and regulations adopted by the Secretary of Transportation.

The district court denied the motion. Analyzing the issue of preemption,[1] the court concluded Congress explicitly expressed an intent in FRSA § 434 to preempt the subject of adequate crossing warnings once the Secretary of Transportation has acted upon this subject,[2] but found no such action had occurred. Despite Burlington's argument that the Secretary took that action by adopting the Manual on Uniform Traffic Control Devices on Streets and Highways (MUTCD), the court held that preemption does not occur until a formal determination is made under the MUTCD of the exact type of warning device to be installed at the crossing. Following the district court's certification under 28 U.S.C. § 1292(b), this appeal was taken.

■■■ We apply a de novo standard of review when considering a decision on summary judgment, *Barnson v. United States*, 816 F.2d 549, 552 (10th Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), and we use the same standard applied in the district court. *Osgood v. State Farm Mut. Auto Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). If no genuine issue of material fact exists, we determine if the substantive law was correctly applied. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Because there are no disputed facts, the issue before us is ripe for summary determination.

## II.

■■ In 1970, with the adoption of FRSA, Congress required the Secretary of Transportation to study and develop solutions to problems associated with railroad grade crossings. 45 U.S.C. § 433(a) (1976). FRSA also directs the Secretary to address the grade crossing safety problem under his authority over highway traffic and safety. 45 U.S.C. § 433(b) (1976). Under the Highway Safety Act, 23 U.S.C. §§ 401–404 (1982), the Secretary has the responsibility to develop uniform standards and to approve state-designed highway safety programs as a condition precedent to the receipt by the state of federal highway funds. Through the Federal Highway Administration, the Secretary prescribed procedures to obtain uniformity in highway traffic control devices and adopted the MUTCD. 23 C.F.R. § 655.601 (1981).[3]

With this background, we begin our analysis by agreeing with the district court that § 434 of FRSA states an express preemption of state law. We also agree preemption does not occur until the Secretary adopts a rule, regulation, or standard covering the subject matter of the state law.

---

1. State law is preempted under the Supremacy Clause of the United States Constitution in three circumstances. *English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). First, Congress can define explicitly the extent to which its enactments preempt state law. *Id.* Second, a pervasive scheme of federal regulation may indicate congressional intent to occupy an entire field. Third, state law is preempted to the extent it actually conflicts with federal law. *Id.*

2. Section 434 states in part:
   The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. *A State may adopt or continue in force any law, rule, regulation, order,* or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.
   45 U.S.C. § 434 (emphasis added).

3. Kansas has specifically adopted the MUTCD standards at Kan.Stat.Ann. § 8–2003 and Kan.Admin.Regs. 82–7–4(c) (1989).

Thus, we must determine whether any of the standards adopted by the Secretary cover the subject matter of the duty to install active warning devices at railroad crossings where unusually dangerous conditions exist.[4]

## III.

While this court has not addressed the question, it has arisen in other courts with mixed results. In *Marshall v. Burlington Northern, Inc.*, 720 F.2d 1149, 1154 (9th Cir.1983), the court said:

> The [MUTCD] prescribes that the selection of devices at grade crossing and the approval for federal funds is to be made by local agencies with jurisdiction over the crossing. Thus, the Secretary has delegated federal authority to regulate grade crossings to local agencies.
>
> The locality in charge of the crossing in question has made no determination under the manual regarding the type of warning device to be installed at the crossing. Until a federal decision is reached through the local agency on the adequacy of the warning devices at the crossing, the railroad's duty under applicable state law to maintain a "good and safe" crossing ... is not preempted.

Following *Marshall*, in *Nixon v. Burlington Northern R.R.*, No. CV 85–384–BLG–JFB, 1988 WL 215409 (D.Mont. May 2, 1988), the court found preemption because, prior to the incident in litigation, the State of Montana made an agreement with the railroad to install flashing light signals with automatic gates at the crossing where the incident occurred. In *Smith v. Norfolk & Western Ry. Co.*, 776 F.Supp. 1335 (N.D.Ind.1991), the court applied *Marshall*

and granted partial summary judgment because prior to plaintiff's accident, the local agency determined the necessary safety devices at the crossing and certified that the project was complete. In *Anderson v. Chicago Cent. & Pac. R.R. Co.*, 771 F.Supp. 227 (N.D.Ill.1991), the court found the railroad failed to present evidence that the Illinois Commerce Commission made any determination under the MUTCD on the type of warning device to be installed at the crossing where the collision occurred.

In *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548 (11th Cir.1991), the court held preemption did not occur where a state, because of financial constraints, failed to implement a decision to install a particular signal device. Finally, in *Southern Pac. Transp. Co. v. Maga Trucking Co.*, 758 F.Supp. 608 (D.Nev.1991), although citing *Marshall*, the court found no preemption where the Nevada Public Service Commission had issued a report recommending the crossing be upgraded with flashing lights and automatic gates, but, at the time of the accident, the improvements had not been made because the railroad claimed it had not received federal funds.

## IV.

The dilemma presented by these varied results must be solved by resort to the language in the regulations adopted by the Secretary. First, all traffic control devices proposed for railroad crossings must comply with the uniform federal standards expressed in the MUTCD. 23 C.F.R. § 646.-214(b)(1).[5] Second, all states must adopt the MUTCD and its revisions in order to receive federal highway funding. 23

---

**4.** Courts have found the Secretary has acted upon other safety subjects. *See, e.g., Burlington Northern R.R. Co. v. State of Mont.*, 880 F.2d 1104 (9th Cir.1989) (cabooses); *Burlington Northern R.R. Co. v. State of Minn.*, 882 F.2d 1349 (8th Cir.1989) (cabooses); *Sisk v. National R.R. Passenger Corp.*, 647 F.Supp. 861 (D.Kan. 1986) (speed limit); *CSX Transp., Inc. v. Public Utils. Comm'n of Ohio*, 901 F.2d 497 (6th Cir. 1990) (hazardous materials), *cert. denied,* — U.S. —, 111 S.Ct. 781, 112 L.Ed.2d 845 (1991); *Norfolk & Western Ry. Co. v. Public Utils. Comm'n of Ohio*, 926 F.2d 567 (6th Cir.1991)

(walkways); *but see Southern Pac. Transp. Co. v. Public Utils. Comm'n of Cal.*, 820 F.2d 1111 (9th Cir.1987) (track clearance and walkways); *Missouri Pac. R.R. v. Railroad Comm'n of Tex.*, 850 F.2d 264 (5th Cir.1988) (cabooses), *cert. denied,* 488 U.S. 1009, 109 S.Ct. 794, 102 L.Ed.2d 785 (1989).

**5.** This provision relates to "grade crossing improvements" and states: "All traffic control devices proposed shall comply with the latest edition of the Manual on Uniform Traffic Control Devices for Streets and Highways supplemented to the extent applicable by State standards."

C.F.R. § 655.603(b)(1). Third, the MUTCD standards are "intended for use both in new installations and at locations where general replacement of present apparatus is made." MUTCD, ¶ 8A–2.

Fourth, the MUTCD specifically states:

With due regard for safety and for the integrity of operations by highway and railroad users, the highway agency and the railroad company are entitled to jointly occupy the right-of-way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad. The determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority. Subject to such determination and selection, the design, installation and operation shall be in accordance with the national standards contained herein.

MUTCD, Part VIII, ¶ 8A–1. This provision is particularly important for two reasons. One, it circumscribes the authority to determine what "devices" shall be erected at a grade crossing to "the public agency with jurisdictional authority." Two, it also makes the "installation and operation" of such devices subject to the determination of that agency. Thus, until a determination of need is made, no new device can be installed or operated at a crossing.

### V.

The operation of ¶¶ 8A–1 and 2 results in a consequence which concerned the district court. Assuming preemption occurred when the MUTCD was adopted or when the Secretary promulgated 23 C.F.R. § 646.-200, the court reasoned that a significant delay could be encountered before a safety device would be installed. The court believed this "gap period" is inconsistent with "the recognized view that '§ 434 manifests an intent to avoid gaps in safety regulations.'" *Hatfield,* 757 F.Supp. at 1205. Moreover, the court found "no regulation promulgated by the Secretary ... which

would *prohibit* a railroad from voluntarily deciding to put in place an improved warning device ... during the gap period." *Id.* at 1206. Thus, the court reasoned, the railroad has the authority (and assumably the duty) to install an improved warning device at a dangerous crossing during the "gap period." We disagree.

The district court's conclusion overlooks the specific language of MUTCD ¶ 8D–1 which states:

The selection of traffic control devices at a grade crossing is determined by public agencies having jurisdictional responsibility at specific locations....

Due to the large number of significant variables which must be considered there is no single standard system of active traffic control devices universally applicable for grade crossings. Based on an engineering and traffic investigation, a determination is made whether any active traffic control system is required at a crossing and, if so, what type is appropriate. *Before a new or modified grade crossing traffic control system is installed, approval is required from the appropriate agency within a given State.*

(emphasis added). This regulation effectively prohibits a railroad from acting on its own to select and install a safety device, contrary to the district court's conclusion. Moreover, it absolves the railroad of any independent duty regarding grade crossing safety devices.[6]

### VI.

The scheme of regulation is patent. Congress expressed an intent to invade the field of grade crossing safety devices, postponing that invasion only until the Secretary of Transportation adopted a rule, regulation, order, requirement, or standard relating to that field. The Secretary has responded by adopting the MUTCD and making it applicable to grade crossings. Recognizing the variability of conditions that can arise at each intersection, the Sec-

---

**6.** *See also* Kan.Stat.Ann. § 8–1512 which states:
(a) No person shall place, maintain or display upon or in view of any highway any unautho-

rized sign, signal, marking or device which purports to be or is an imitation of or resembles an official ... railroad sign or signal.

retary has delegated to local authority the responsibility of assessing the needs and establishing the design for safety devices. Nonetheless, the statutory mandate for the adoption of a standard that would supplement any state requirement for grade crossing safety devices is satisfied by the adoption of the MUTCD. To that extent then, we disagree with *Marshall.*

Our disagreement with *Marshall* goes beyond our differing analysis of language in FRSA and MUTCD pertaining to pre-emption of common law standards of care for grade crossings, however. Continuing resort to common law standards after a state adopts MUTCD disrupts a basic purpose of FRSA as it is implemented by the provision of funding, namely, recognition of priorities. FRSA contemplates that some sites are more dangerous than others and that resources should first be put to use on the more dangerous ones, all in accordance with a rational scheme based on surveys. This is a prospective-looking system. Jury verdicts based on common law standards, which are of a high degree of abstraction and generality, are retrospec-tive-looking and are addressed to only one crossing rather than a system of crossings. The hit-or-miss common law method runs counter to a statutory scheme of planned prioritization.

Having adopted the MUTCD, the Secretary prescribed the standard required by 45 U.S.C. § 434, and any state law relating to grade crossing safety devices was then su-perseded. All § 434 requires for preemp-tion to occur is the adoption of the stan-dard, and the MUTCD contains the stan-dard. Postponing the determination of what specific device is required for a given grade crossing is simply a matter of imple-menting that standard. The scheme enact-ed by Congress did not anticipate that the effect of the standard was to be deferred or made selectively applicable for each grade crossing in the United States. To the contrary, once the Secretary adopted the standard, its superseding effect became uniform throughout the nation.

We do not believe leaving responsibility for implementation of the standard to local authority diminishes this result. Requiring a local survey of grade crossings to deter-mine need and design is no more than a pragmatic response to the multitude of con-ditions that exist throughout the country which dictate whether and what kind of a device is required at a specific place. Nonetheless, with the adoption of the MUTCD, the Secretary has absolved rail-roads from complying with duties imposed by state law regarding safety devices at grade crossings. Without such a duty, a railroad cannot be liable in common law negligence for failure to provide adequate safety devices at a grade crossing.

The judgment of the district court is REVERSED and REMANDED with in-structions to grant defendant's motion for summary partial judgment and for further proceedings on plaintiff's remaining claims.